IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Metro Federal Credit Union, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 08 C 4087 |
| v. | ) | |
| | ) | Judge: David H. Coar |
| Federal Insurance Company, | ) | |
| | ) | Magistrate Judge: Morton Denlow |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FILED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

Plaintiff, Metro Federal Credit Union ("Metro") has filed a two Count Complaint against Defendant Federal Insurance Company ("Federal"). In Count I, Metro alleges that Federal breached its insurance contract with Metro by declining to pay a claim for loss Metro allegedly sustained arising out of loans it made to one of its customers, Arbor Green, Ltd. ("Arbor"). In Count II, Metro claims that Federal's denial of the claim constituted a "vexatious refusal to pay" in violation of 215 ILCS 5/155 which subjects Federal to the penalties set forth in that Statute. Federal has filed a Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

Federal's Motion should be granted because the allegations of the Complaint, taken as true for purposes of the Motion, establish, as a matter of law, that Metro's loss is not covered by the insurance contract in question. Accordingly, Federal has no liability to Metro for breach of contract or for vexatious refusal to pay Metro's claim.

## FACTS

In 2005, Federal issued an insurance policy specifically identified as Financial Institution ForeFront Security by Chubb Credit Union Bond No. 82048405 (the "Bond") to Metro as the Assured. A true and correct copy of the Bond is attached to the Complaint as Ex. 1. In relevant

part, the Bond provides coverage for losses resulting directly from materially fraudulent alterations, on one of the specifically identified and defined types of documents set forth in various Insuring Clauses, subject to its Conditions and Limitations.

As a general matter, most of the Insuring Clauses do not cover losses resulting from the non-payment or default on any loan.  Further, losses resulting from any alteration, as is alleged in the Complaint, are only covered if the loss falls within the coverage provided under Insuring Clauses 1, 16 and 17.  Specific Exclusion 6 of the Bond states that it is applicable to all Insuring Clauses except Insuring Clauses 1, 16 and 17 and further provides that:

> 6.   **This Bond does not directly or indirectly cover:**
>
> A.   loss resulting from the complete or partial non-payment of or default on any **Loan** whether such **Loan** was procured in good faith or through trick, artifice, fraud or false pretenses.  However, this Exclusion shall not apply to INSURING CLAUSES 8., 9.B., 9.C., 10., 15. or 21.,
>
> B.   loss resulting from forgery or any alteration,
>
> C.   loss involving a counterfeit.  However, this Exclusion shall not apply to INSURING CLAUSE 6.,
>
> D.   loss resulting from any **Trade**.  However, this Exclusion shall not apply to INSURING CLAUSE 8. or 9., or
>
> E.   loss involving **Item of Deposit** which are not finally paid for any reason including, but not limited to, forgery or any other fraud.  However, this Exclusion shall not apply to INSURING CLAUSE 8., 9., 10. OR 15.

Comp. Ex. 1, Bond p. 30.

Only two of the Bond's Insuring Clauses are at issue in this controversy:  Insuring Clause 16 (Forgery and Alteration) and Insuring Clause 17 (Extended Forgery).

2

Insuring Clause 16 of the Bond provides coverage for:

Loss resulting directly from:

A.      **Forgery** on, or fraudulent alternation of, any **Negotiable Instrument** (other than an **Evidence of Debt**), **Acceptance**, **Withdrawal Order** or receipt for the withdrawal of **Property**, **Certificate of Deposit** or **Letter of Credit**, or

B.      transferring, paying or delivering any funds or other **Property**, or establishing any credit or giving any value in reliance on any written instructions to the ASSURED authorizing or acknowledging the transfer, payment, delivery or receipt of funds or other **Property**, which instructions fraudulently purport to bear the handwritten signature of any **Member**, financial institution, or **Employee**, but which instructions either bear a **Forgery** or have been fraudulently materially altered without the knowledge and consent of such **Member**, financial institution or **Employee**.

For the purpose of this INSURING CLAUSE, a mechanically reproduced facsimile signature is treated the same as a handwritten signature.

Comp. Ex. 1, Bond p. 8, ¶ 16.[1]

Insuring Clause 17 of the Bond provides coverage for:

Loss resulting directly from the ASSURED having, in good faith, for its own account or the account of others:

A.      acquired, sold or delivered or given value, extended credit or assumed liability, in reliance on any original:

    (1)    **Certified Security**,
    (2)    deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property,
    (3)    **Certificate of Origin** or **Title**,
    (4)    **Document of Title**,
    (5)    **Evidence of Debt**,
    (6)    corporate, partnership or personal **Guarantee**,
    (7)    **Security Agreement**, or
    (8)    **Instruction**, which

            a.    bears a **Forgery**, or
            b.    is fraudulently altered, or
            c.    is lost or stolen, or

---

[1] The terms which appear in bold are defined in the Bond.  Comp. Ex. 1, Bond pp. 15-27.

6349912v3 890306 54

C.      guaranteed in writing or witnessed any signature on any transfer, assignment, bill of sale, power of attorney, or endorsement upon or in connection with any item listed above, which pass or purport to pass title to such items, or

D.      acquired, sold or delivered, or given value, extended credit or assumed liability in reliance on any item listed in A.(1) through A.(4) above which is a **Counterfeit Original**.

Actual physical possession, and continued actual physical possession if taken as collateral, of the items listed in A.(1) through A.(8) above by the ASSURED or a correspondent Federal or State chartered deposit institution or an authorized representative of the ASSURED is a condition precedent to the ASSURED having relied on such items.   Release or return of such collateral is an acknowledgement by the ASSURED that it no longer relies on such collateral.

For the purpose of this INSURING CLAUSE, a mechanically reproduced facsimile signature is treated the same as a handwritten signature.

Comp. Ex. 1, Bond  pp. 8-9.

Arbor was in the landscaping and tree maintenance business.  Comp. ¶¶ 19-20, 22.  Scott G. Franz was the vice-president, treasurer and shareholder of Arbor.  *Id*. at ¶ 21.  Regina A. Franz, Scott's wife, was the president of Arbor.  *Id*.  Arbor obtained a line of credit from Metro which was to be secured by its accounts receivables.   *Id*. at ¶¶ 22-26.  In connection therewith, Arbor, by its vice-president and president, executed a Business Credit and Continuing Security Agreement ("Credit Agreement"), a Business Guaranty ("Guaranty"), both dated as of August 23, 2004, and two Business Loan Receipts Agreements ("Receipts").  Comp. ¶ 22

In order to borrow funds from Metro in accordance with these various Agreements, Arbor submitted documents entitled Accounts Receivable Advance Requests ("Advance Requests") to Metro.  *Id*.  Each Advance Request was accompanied by an invoice on Arbor stationary which was directed to Arbor's customer and which purportedly represented monies owed by that customer to Arbor.  Copies of the Advance Requests and fraudulent invoices are attached to the Complaint as Exhibits 3-13 and copies of actual invoices submitted to Arbor's customers are also included in Exhibits 3, 4, 5, 7, 9, and 10 of the Complaint.  Metro advanced loan proceeds to

Arbor in the amount of approximately 75% of the invoice, taking as security for that advance the customer's debt to Arbor purportedly evidenced by the invoice. Comp. ¶ 25.

In its Complaint, Metro alleges that Arbor "fraudulently altered" the invoices which it submitted to it by "inflating the amount" of the invoices and that Arbor "falsified" the related Advanced Requests accordingly. Comp. ¶¶ 27-28  Some of the Exhibits to Arbor's Complaint, including Exhibits 3, 4, 5, 7, 9 and 10, establish the details of Arbor's purported scheme. Comp. Exs. 3-5, 7, 9 and 10.  As demonstrated by those documents, Arbor would create and send an original invoice to its customer, for example the City of Elgin, which correctly listed the amount which Elgin owed Arbor for landscaping services. *Id.*  Arbor then created a separate invoice and inserted a different "inflated" amount as the sum owed by Elgin to it. *Id.*  This "inflated" invoice was then delivered to Metro, along with an Advance Request which listed the amount of the inflated invoice as the amount owed by the City of Elgin to Arbor. *Id.*  That is to say, the Exhibits to the Complaint clearly establish that the scheme encompassed various episodes, each of which involved two separate and distinct invoices – the "correct" invoice sent by Arbor to its customer and the "inflated" invoice sent by Arbor to Metro. (See the documents and particularly the invoices attached as part of Exhibits 3, 4, 5, 7, 9 and 10 of the Complaint.)

Metro alleges that it relied on the inflated invoices and loaned Arbor monies it would not have loaned otherwise. Comp. ¶ 30.  Arbor allegedly defaulted on its obligation to repay Metro causing Metro to sustain damages in the amount of $309,026. *Id.* at ¶¶ 31-32.

## APPLICABLE LEGAL PRINCIPLES

A cause of action should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) when, as here, the pleadings, including the Exhibits attached to the Complaint, establish that the Plaintiff cannot recover as a matter of law. *Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005); *Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642, 645 (7th Cir. 2006)

6349912v3 890306 54

("plaintiff 'may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment.'")  Construction of an insurance policy, such as the Bond at issue, is a question of law to be determined by the Court.  *A. Miller & Company v. The Cincinnati Ins. Co.*, 217 Ill.App.3d 572, 574 (3rd Dist. 1991); *Alpine State Bank v. Ohio Casualty Ins. Co.*, 941 F.2d 554, 559 (7th Cir. 1991) (holding "[t]he construction of an insurance policy, or the interpretation of a bankers blanket bond, is a question of law to be determined by a court."). Where the Bond is unambiguous, it should be construed according to the plain and ordinary meaning of its terms and just like any other contract.  *Id*.  Definitions which are included within the Bond are controlling.  *Id.*, 941 F.2d at 560.  Ambiguities are not created because parties disagree about the meaning of the language within the Bond.  *A. Miller & Company*, 217 Ill.App.3d at 575; *see generally Capitol Bank of Chicago v. Fidelity and Casualty Company of New York*, 414 F.2d 986 (7th Cir. 1969).

### METRO'S ALLEGED LOSS IS NOT COVERED BY INSURING CLAUSE 16

Given the facts of this case, in order to be entitled to coverage under Insuring Clause 16.A Metro must prove that it sustained a loss resulting directly from a "fraudulent alteration" of one of five types of documents specifically identified and defined in the Bond.  In order to be entitled to coverage under Insuring Clause 16.B, Metro must prove that it sustained a loss resulting directly from its loaning money[2] to Arbor "in reliance on any written instructions to the Assured [i.e., Metro] . . . which bear the handwritten signature of any Member, financial institution, or Employee, but which instructions . . . have been fraudulently materially altered without the knowledge or consent of such Member, financial institution, or Employee."  The

---

[2]  "Transferring, paying or directing any funds or other Property or establishing any credit or giving any value . . . ."

6349912v3  890306  54

facts set forth in Metro's Complaint and the Exhibits thereto demonstrate that Metro cannot prove the elements necessary to establish its entitlement to coverage.

**Neither the Invoices Nor the Advance Requests Are One of the Five Specifically Identified and Defined Types of Documents For Which Coverage is Provided by Insuring Clause 16.A**

In order for Insuring Clause 16.A to apply, the invoices and/or Advance Requests must be either a (1) Negotiable Instrument, (2) Acceptance, (3) Withdrawal Order or receipt for withdrawal of Property, (4) Certificate of Deposit or (5) Letter of Credit. Neither the invoices nor Advance Requests are any of these types of documents.

Neither the invoices nor the Advance Requests are Negotiable Instruments as that term is defined under the Bond. The Bond defines a Negotiable Instrument as a share draft or writing which is:

> (1) signed by the maker or drawer,
>
> (2) containing an unconditional promise or order to pay a sum certain in **Money** and no other promises, order, obligation or power given by the maker or drawer,
>
> (3) is payable on demand or at a definite time, and
>
> (4) is payable to order or bearer.

Comp. Ex. 1, Bond p. 23. Clearly, neither the invoices nor the Advance Requests meet any of these requirements and they are not Negotiable Instruments under the Bond.

An Acceptance, another defined term in the Bond, refers to a draft which Metro has signed and agreed to honor as presented. Comp. Ex. 1, Bond p. 15. Since there is no draft which Metro has signed and agreed to honor as presented at issue here, this term does not apply.

The third category consists of a Withdrawal Order or receipt for withdrawal of Property. Withdrawal Order is defined as a "non-negotiable instrument, other than an Instruction, signed by [Arbor] authorizing [Metro] to debit [Arbor's] account …." Neither the invoices nor the

7

Advance Requests fall within this narrow set of documents. Similarly, they are not receipts issued by Metro as a result of a withdrawal made by Arbor of Property.

A Certificate of Deposit is defined as a written acknowledgement "by a financial institution of receipt of Money with an engagement to repay it." Comp. Ex. 1, Bond p. 16. Neither the invoices nor the Advance Requests contain any acknowledgement by any financial institution referring to the receipt of money. Consequently, they do not fall within the fourth category of documents.

The fifth and final category of documents covered by Insuring Clause 16.A is a Letter of Credit. A Letter of Credit is defined as a written engagement by a bank or person stating that the bank or person will honor demands for payments which meet the conditions of the written engagement. Comp. Ex. 1, Bond p. 22. The invoices and Advance Requests clearly do not fall into this final category of documents.

Because neither the invoices nor the Advance Requests fall within any category of documents enumerated in Insuring Clause 16.A, there is no coverage under Insuring Clause 16.A.

**Neither the Invoices Nor the Advance Requests Are Written Instructions Containing a Fraudulent Handwritten Signature as Required For Coverage Under Insuring Clause 16.B of the Bond.**

In order for coverage to attach under Insuring Clause 16.B of the Bond, Metro must have sustained a loss resulting directly from its loaning money to Arbor based upon written instructions to it which fraudulently purport to bear the handwritten signature of any Member, financial institution or Employee which have been fraudulently materially altered without the knowledge or consent of such Member, financial institution or Employee. Neither the invoices nor the Advance Requests meet these coverage requirements.

6349912v3 890306 54

The invoices fail to meet the Bond's requirements in various respects. They are not "written instructions" delivered to Metro but demands by Arbor to its customers seeking payment for its services. Further, they do not contain a fraudulent handwritten signature of a Member, financial institution or Employee. Finally, as will be discussed more fully below, they are not fraudulently materially "altered" as defined by Illinois law without the knowledge or consent of such Member, financial institution or Employee.

The Advance Requests likewise fail to meet the Bond's requirements. They are, on their face, "requests" rather than "instructions." Moreover, they do not contain a fraudulent handwritten signature of any Member, financial institution or Employee. Rather, the signatures on them are genuine and are affixed as representatives of Arbor, a borrower/debtor of Metro, and not as a Member, financial institution or Employee. Finally, as discussed below, they were not fraudulently materially "altered" as that phrase is interpreted by Illinois law without the knowledge or consent of such Member, financial institution or Employee.

The ruling in the case *First Union Corp. v. U.S. Fidelity & Guaranty Co.*, 126 Md.App. 499, 730 A.2d 278 (Md.App. 1999) illustrates that neither the invoices nor the Advance Requests are instructions to Metro as referred to in Insuring Clause 16.B of the Bond. In *First Union Corp.* the court interpreted a bond provision similar to paragraph 16.B. The bond provision in *First Union Corp.* provided coverage, in pertinent part, for loss resulting from:

> transferring, paying or delivering any funds or Property or establishing any credit or giving any value on the faith of any written instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property, ….

*Id.*, 126 Md.App. at 504, 730 A.2d at 281. Thus, it is almost identical to paragraph 16.B with the primary exception that the *First Union Corp.* bond refers to "written instructions or advices" while the Bond at issue refers to "written instructions". The fraud in *First Union Corp.* involved

9

two forged incumbency certificates submitted to establish the fraudsters authority to act on behalf of Philip Morris. *First Union Corp.*, 126 Md.App. at 504, 730 A.2d at 281. The incumbency certificates did not qualify as instructions or advices since "'instructions and advices' refer principally to commercial paper, such as checks and drafts." *Id.*, 126 Md.App. at 509, 730 A.2d at 283. The incumbency certificates were clearly not commercial paper. Similarly, the invoices and Advance Requests are not commercial paper and do not otherwise constitute written instructions.

### THERE IS NO COVERAGE UNDER INSURING CLAUSE 17 OF THE BOND

In order to be entitled to coverage under Insuring Clause 17, Metro must prove that it sustained a loss resulting directly from its loaning money to Arbor in reliance upon one of eight types of documents specifically identified in Insuring Clause 17 and that such documents were "fraudulently altered." Neither the invoices nor Advance Requests at issue are any of the types of documents enumerated in Insuring Clause 17. Further, neither were fraudulently "altered" as defined by Illinois law, as will be discussed below. For either or both of these reasons, Insuring Clause 17 of the Bond does not provide coverage to Metro for its alleged loss, as a matter of law.

Insuring Clause 17 covers the following types of documents and only these types of documents: (1) Certified Security; (2) deed, mortgage or other instrument conveying title to real property; (3) Certificate of Origin or Title; (4) Document of Title; (5) Evidence of Debt; (6) corporate, partnership or personal Guarantee; (7) Security Agreement; or (8) Instruction.[3] Comp. Ex. 1, Bond p. 8.

Neither the invoices nor the Advance Requests are Certified Securities as defined by the Bond. While the Bond contains a more complete definition, at a minimum a Certified Security

---

[3] The capitalized terms have been defined in the Bond.

6349912v3 890306 54

consists of "an instrument" which represents "a share, participation or other interest in property of, or an enterprise of, the issuer or an obligation of the issuer." Comp. Ex. 1, Bond p. 16. Neither the invoices nor the Advance Requests represent a participation or interest in property or an obligation of the issuer.

The second through fourth categories of documents consist of documents of title to real and personal property. Neither the invoices nor the Advance Requests are documents of title.

The fifth type of document covered by Insuring Clause 17 of the Bond is Evidence of Debt specifically defined as follows:

> **Evidence of Debt** means an instrument, including a **Negotiable Instrument**, executed by a customer of [Metro] and held by [Metro], which in the regular course of business is treated as evidencing the Member's debt to [Metro].

In order for the invoices or Advance Requests to be Evidence of Debt under the Bond, they must evidence Arbor's debt to Metro. *See Pine Bluff National Bank*, 346 F.Supp.2d at 1027; *First Union Corp.*, 126 Md.App. at 507, 730 A.2d at 282 ("[e]vidence of debt refers to primary indicia of debt, such as promissory notes or other instruments that reflect a customer's debt to the bank.") Clearly, neither the invoices nor the Advance Requests are negotiable instruments, promissory notes or other instruments evidencing a debt to Metro. Consistently, they are not Evidence of Debt as defined in the Bond.

The sixth and seventh categories of documents consist of Guarantees or Security Agreements. A Guarantee is generally defined as the written agreement of "the signer to pay the debt of another to [Metro] ...." Comp. Ex. 1, Bond p. 22. A Security Agreement "means an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." Comp. Ex. 1, Bond p. 24. Neither the invoices nor the Advance Requests in this case are Guarantees or Security Agreements as they do not fall within these definitions.

11

The final category of document, covered by Insuring Clause 17, is an Instruction, defined as a "written order to the issuer of an Uncertificated Security requesting that the transfer, pledge or release from pledge of the specified Uncertificated Security be registered." Comp. Ex. 1, Bond p. 22. Neither the invoices nor the Advance Requests meet the parameters of this very specific definition.

Insuring Clause 17 of the Bond does not provide coverage because neither the invoices nor the Advance Requests are the type of documents specifically enumerated therein. The Court need go no further in order to grant Federal's Motion to Dismiss. *See* Comp., Comp. Ex. 1, Bond, Specific Exclusion 6, p. 30.[4] Further, as more fully described below, neither the invoices nor the Advance Requests were fraudulently "altered" as defined by Illinois law giving the Court an additional basis on which to grant Federal's Motion.

**THERE IS NO COVERAGE UNDER EITHER INSURING CLAUSE 16 OR 17 OF THE BOND BECAUSE NEITHER THE INVOICES NOR THE ADVANCE REQUESTS WERE FRAUDULENTLY "ALTERED" AS DEFINED BY ILLINOIS LAW**

In order to be entitled to coverage under either Insuring Clause 16 or 17, Metro must prove that either the invoices or the Advance Requests at issue were fraudulently "altered." Metro does not, and cannot, allege any alteration on the Advance Request, ending the inquiry as to that document. Moreover, the invoices delivered to Metro were not "altered" thereby precluding coverage for those documents.

Although the Bond does not define the term "altered," several courts have addressed similar language found in financial institution bonds. In *Pine Bluff National Bank v. St. Paul Mercury Insurance Co.* the court considered whether a bank had coverage under a financial institution bond for losses incurred as a result of extending credit in reliance on leases which the

---

[4] As a result of the facts alleged in the Complaint, the only Insuring Clauses which could ostensibly be raised are 16 and 17.

bank claimed were forged, altered or counterfeited. The bank-insured's customers had executed "true leases" which the customer had in its records. The customer did not alter or modify these "true leases." Rather, it created similar fake leases, which contained terms different than those on the "true leases." The customer delivered the fake leases to the bank as security for loans. *Pine Bluff National Bank v. St. Paul Mercury Insurance Co.*, 346 F.Supp.2d 1020 (E.D.Ark. 2004). The bank-insured claimed that the fake leases were alterations of "true leases" which had not been delivered to it. *Id.*, 346 F.Supp.2d at 1028. The court held that the documents the bank relied upon did not contain alterations since an alteration would have to be made to the "true leases" executed by the customers and that such "true leases" had not been altered or delivered to the bank. *Id.*

In *Utica Mutual Ins. Co. v. Precedent Companies, LLC* a mortgage company asserted a claim under a financial institution bond claiming that a wrongfully deposited check constituted an alteration since it was deposited "in breach of the conditions under which it was delivered." *Utica Mutual Ins. Co. v. Precedent Companies, LLC*, 782 N.E.2d 470, 477-78 (Ind.App. 2003). The bond did not define alteration so the court considered and applied the definition of "alteration" found in the Indiana Uniform Commercial Code ("UCC"). *Id. citing* Indiana Code § 26-1-3.1-407. The court held that the UCC's definition of alteration applied and held that the check had not been altered since there was no evidence of an unauthorized change to the instrument which modified the obligation of any party. *Id.*; *see also Charter Bank N.W. v. Evanston Ins. Co.*, 791 f.2d 379, 383 (5th Cir. 1986) (applying Texas UCC to determine whether certificates of deposit were covered under a bond as altered documents and holding that "[a]lteration presupposes a genuine instrument that has been fraudulently changed.")

The Illinois legislature has defined alteration as:

6349912v3 890306 54

"Alteration" means (i) an unauthorized change in an instrument that purports to modify in any respect the obligation of a party, or (ii) an unauthorized addition of words or numbers or other change to an incomplete instrument relating to the obligation of a party.

810 ILCS 5/3-407(a).  In the present case, the allegations and Exhibits incorporated into the Complaint establish that the invoices delivered to Metro were different than the invoices sent to Arbor's customers.  They were not the original invoices (i.e., those sent to Arbor's customers were) but rather fake invoices which stated amounts which were inflated from the originals.  As such, these fake invoices were not altered as defined by Illinois law.  Consistently, they did not modify the obligation of Arbor's customers.  See Comp. ¶¶ 27-30.  Metro has pled facts and attached documents to its Complaint which establish, as a matter of law, that the invoices were never altered.  *RBC Mortgage Co. v. National Union Fire Ins. Co. of Pittsburgh*, 349 Ill.App.3d 706, 714 (1st Dist. 2004) ("Courts will not strain to find ambiguity in a policy where none exits.")

**In the Event This Court Dismisses Count I, Count II of Complaint Should be Dismissed For Failure to State a Claim**

In Count II, Metro asserts a claim under 215 ILCS 5/155 for unreasonable and vexatious refusal to provide coverage under the Bond.  In the event that this Court dismisses Count I for failure to state a claim upon which relief may be granted, then it follows that Count II would also be subject to dismissal.  It stands to reason that there could be no claim under 215 ILCS 5/155 in the event that there is no claim for breach of the Bond.  Thus, in the event that this Court agrees with Federal and dismisses Count I, then it should also dismiss Count II.

CONCLUSION

For the reasons stated herein, Counts I and II of the Complaint should be dismissed for failure to state a claim upon which relief may be granted.

6349912v3 890306 54

Donald L. Mrozek, #1979620
Richard B. Polony, #6227043
Nabil G. Foster, #6273877
Hinshaw & Culbertson LLP
222 North LaSalle Street
Suite 300
Chicago, IL  60602-1081
312/704-3000

HINSHAW & CULBERTSON LLP


By: /s/ Richard B. Polony_____ _____
        One of Its Attorneys

6349912v3 890306 54

## CERTIFICATE OF SERVICE

I certify that pursuant to Local Rule 5.5, service of the foregoing Defendant Federal Insurance Company's Memorandum in Support of Motion to Dismiss Filed Pursuant to Federal Rule of Civil Procedure 12(b)(6) was accomplished upon all Filing Users pursuant to the Court's Electronic Case Filing system on August 15, 2008.

/s/   Richard B. Polony _____

6349912v3  890306  54