IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| METRO FEDERAL CREDIT UNION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 08 C 4087 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| FEDERAL INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

Plaintiff Metro Federal Credit Union ("Metro") has filed a two-count complaint against Defendant Federal Insurance Company ("Federal"), alleging breach of contract and vexatious refusal to pay, in violation of Illinois law, 215 ILCS 5/155. Before the court is Federal's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is DENIED.

### I. Background

Metro, a federally chartered credit union organized in Illinois under the Federal Credit Union Act, 12 U.S.C. §§ 1751 *et seq.*, with its principal place of business in Illinois, initially filed its complaint against Federal in an Illinois court, demanding over $300,000 in damages. Federal, an Indiana corporation with its principal place of business in New Jersey, timely sought removal to this court under 28 U.S.C. §§ 1441 and 1446. Because the parties are citizens of different states and the amount in controversy exceeds $75,000, the court may adjudicate the case under its diversity jurisdiction. 28 U.S.C. § 1332.

### The Bond

In its complaint, Metro alleges that it purchased from Federal a "Financial Institution Forefront Security By Chubb Credit Union Bond" ("the Bond") in 2005. Compl. ¶8. The Bond covered the period of May 1, 2005 to May 1, 2008. *Id.* ¶9. Metro alleges that it purchased the Bond to protect it in the event of fraudulent and dishonest acts by employees and/or third parties, and that it reasonably expected broad coverage for losses resulting from its giving value or extending credit in reliance on forged or fraudulently altered documents . *Id.* ¶13.

Metro submitted the Bond along with its complaint. Among other clauses, the Bond provides coverage for Metro under insuring clauses 16 (Forgery and Alteration) and 17 (Extended Forgery), each with coverage limits of $1.5 million and a $1,000 deductible. *Id.* ¶14. Metro alleges that Insuring clauses 16 and 17, when construed in conjunction with the entirety of the Bond, provide coverage for loss resulting from Metro's giving something of value or extending credit in reliance on instruments that are forged or fraudulently altered. *Id.* ¶17.

### The Arbor Green Default

Metro alleges that, during the period covered by the Bond, it negotiated credit agreements with Scott G. Franz and Regina A. Franz, on behalf of their landscaping and tree maintenance business, Arbor Green, Ltd. The agreements were memorialized in two documents that the Franzes executed on August 23, 2004: a Business Credit and Continuing Security Agreement and a Business Guaranty Agreement, along with Business Loan Receipts that the Franzes executed on that day and thereafter, which established the credit limit (collectively, "the Agreements"). *Id.* ¶¶20-22. The Agreements designated the terms and conditions for Metro's advancing funds to Arbor Green. *Id.* ¶23. Arbor Green could borrow money on its line of credit in amounts up to 75% of its outstanding accounts receivables. *Id.* ¶25. And Arbor Green could

borrow money on this line of credit only if an "Accounts Receivable Advance Request" ("Advance Request") was approved. *Id.* ¶24.

In each Advance Request, Arbor Green was required to provide documentation of its accounts receivables, which it would pledge as collateral for each loan. *Id.* ¶26. Metro submitted along with its complaint copies of the Advance Requests. Compl. Ex. 3. Each Advance Request identifies itself as an "application by Arbor Green, Ltd. for Accounts Receivable Financing," for a specified amount, "according to the terms of the BUSINESS CREDIT AND SECURITY AGREEMENT. . . . Approval by a duly authorized signatory of Arbor Green, Ltd. constitutes agreement to all the terms and conditions stated therein and constitutes a binding legal obligation to repay the principal sum advanced and all interest accrued as stipulated therein." Under the heading "Description of Collateral Pledged," Arbor Green would identify an invoice by number, date, and amount purportedly owed under it; calculate the maximum advance allowable under the Agreements, along with a recourse date; and date and sign the Advance Request. Compl. Ex. 3.

Metro alleges that Arbor Green, at Scott Franz's direction, submitted fraudulent invoices and falsified the related Advance Requests, along with other documentation, to cause Metro to extend loans under the Agreements that Metro would not have otherwise extended. *Id.* ¶27. Arbor Green, by and/or at Mr. Franz's direction, fraudulently altered invoices pledged to Metro as collateral by inflating the invoice amounts or otherwise manipulating Arbor Green's invoice forms in a manner not truly reflective of amounts billed to or owed by Arbor Green's customers. *Id.* ¶28. Metro submitted copies of those invoices and incorporated them in its complaint. *Id.* ¶29. Metro says that, in reliance on the inflated invoices, and without knowledge of their falsity, it loaned Arbor Green funds that it would not have loaned but for the fraud. *Id.* ¶30. As a result

of Arbor Green's default on the Accounts Receivable Loan, Metro sustained loss in the amount of at least $309,027. *Id.* ¶32.

### Coverage for the Arbor Green Loss

Metro alleges that the loss it incurred as a result of Arbor Green's default falls within the scope of coverage under the Bond and is not otherwise excluded from the Bond. *Id.* ¶33. As required by the Bond, after discovering its injury Metro gave Federal notice of its loss and sought coverage for it. *Id.* ¶34. Federal denied coverage initially and upon multiple reconsiderations. *Id.* ¶¶35-36.

Metro alleges that, because it performed and satisfied all conditions for coverage under the Bond, or is otherwise excused from such performance and satisfaction of conditions, Federal is obligated to provide coverage to Metro for the loss it incurred as a result of Arbor Green's fraudulent activities. *Id.* ¶¶40-41. Metro alleges damages in the amount of $309,027, and seeks foreseeable consequential damages, pre-judgment interest for liquidated sums, and attorneys' fees and costs in this action. *Id.* ¶¶43-45.

Metro further alleges that Federal's initial refusal to pay Metro for the loss violates the terms, provisions, and intent of the Bond, and was vexatious, without reasonable cause or excuse, outrageous, and in bad faith. ¶47. And Metro alleges that Federal's continued refusal, despite repeated requests by Metro to reconsider coverage under the Bond, is vexatious, without reasonable cause, and in bad faith. ¶49.

## II. Legal Standard

On a motion to dismiss, the court accepts as true all well-pleaded allegations in the plaintiff's complaint, drawing all possible inferences in the plaintiff's favor. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Dismissal is appropriate only if, after

accepting as true all facts in the complaint, the plaintiff cannot plausibly succeed. *Id.* at 1086. Where, as here, the plaintiff submits along with its complaint copies of contracts and other documents referenced therein, the court also may consider them. *Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005). And, if the unambiguous terms of an attached contract conflict with the plaintiff's allegations, the contract controls. *INEOS Polymers Inc. v. BASF Aktiengesellsch*, 553 F.3d 491, 498 (7th Cir. 2009); *Centers*, 398 F.3d at 933.

### III. Analysis

Federal argues that Metro's allegations, taken as true, show that Metro's loss is not covered by the Bond, and thus that Metro is not legally entitled to relief. The parties agree that Illinois law governs interpretation of the Bond.

"An insurance policy is a contract, and the general rules governing the interpretation of other types of contracts also govern the interpretation of insurance policies." *Hobbs v. Hartford Ins. Co.*, 823 N.E.2d 561, 564 (Ill. 2005). Under Illinois law, "a court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). Contracts should be read as a whole, and the "intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Id.* If an insurance policy's language is unambiguous, it will be applied as written. *Hobbs*, 823 N.E.2d at 564. Generally, if a term in an insurance policy is ambiguous—i.e., if it is subject to more than one reasonable interpretation—it will be liberally construed in favor of coverage. *Id.*[1]

---

[1] In interpreting a bond containing terms from a standard "fidelity" or Bankers Blanket Bond under Wisconsin law, the Seventh Circuit has noted that, because such standard terms were negotiated at arms-length by representatives from both the banking and insuring industries, there is no need to construe liberally their ambiguous language. *See First Nat'l Bank of Manitowoc*, 485 F.3d 971, 976-77 (7th Cir. 2007). The court concluded that only ambiguous non-standard terms should be construed in favor of coverage. *Id.* at 977. The Seventh Circuit's reasoning may well apply to the Bond here. But because the parties have not attempted to differentiate

A. Construing Multiple Documents as a Single Instrument

As an initial matter, the parties dispute whether any of the documents Metro relied on may be considered together as a "single instrument." Metro argues that the court should construe together the entire series of documents memorializing its relationship with Arbor Green—the Agreements, the Advance Requests, and the invoices—as a single instrument. Federal responds that none of these documents may be construed together.

In Illinois, "instruments executed for the same purpose and in the course of the same transaction will be construed as a single instrument." *Community State Bank of Galva v. Hartford Ins. Co.,* 542 N.E.2d 1317, 1320 (Ill. App. Ct. 1989). "Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect." *Tepfer v. Deerfield Savs. & Loan Ass'n*, 454 N.E.2d 676, 679 (Ill. App. Ct. 1983) (citation and quotation marks omitted).

The court is not persuaded that *all* of the documents exchanged between Metro and Arbor Green were "executed for the same purpose," and most of them were not "contemporaneous." Rather, the initial Agreements were executed to create a line of credit and to establish the terms by which Arbor Green could obtain an advance on that line of credit. Under those Agreements, Arbor Green would execute an Advance Request to obtain a loan, which would be secured by collateral identified in the Advance Request. The invoices—the documents allegedly bearing the fraudulent alterations—were submitted with the Advance Requests to evidence that collateral. So it would be a stretch to say that the invoices were part of the same instrument or

---

between "standard" and "non-standard" terms, the court will revert to Illinois's general presumption that ambiguous terms should be interpreted in favor of coverage.

-6-

contemporaneous writing as the Agreements; they were executed at different times, and for different (but related) purposes.

It is not a stretch, however, to consider the invoices part of the same instrument as the Advance Requests to which they were attached (or, alternatively, that each Advance Request expressly incorporated each invoice). In *Community State Bank*, for example, the bank, relying on a forged power of attorney, loaned the forger $30,000 after he executed a promissory note at the bank. The bank sought coverage under a bond providing for losses resulting from a forgery of an evidence of debt or negotiable instrument, but the insurer denied the claim on the ground that the bank had relied on the forged power of attorney rather than the promissory note. The Illinois court disagreed, explaining that it would be "simply unreasonable" not to consider both the forged power of attorney and the promissory note together in determining coverage under the bond. The court noted that the two documents were delivered simultaneously, and that the promissory note would not have been honored without the power of attorney. *Id.* In the court's words, "[n]ot only was the Bank relying on the power of attorney as granting Everett authority to obtain credit in Craig's name, but it was also legally relying on the executed promissory note as consideration for making the loan. The documents were both necessary for Everett to complete his scheme, both delivered contemporaneously to the Bank, and both necessary in order for the Bank to extend credit." *Id.*

Similarly, the invoices here, although they purport to memorialize a separate transaction, were delivered along with the Advance Requests as evidence of collateral. And like the forger's promissory note without a power of attorney, Arbor Green would not have obtained a loan had it submitted an Advance Request without an invoice; Arbor Green was required under the Agreements to submit them with each Advance Request. *See also Omnisource Corp. v.*

*CAN/Transcontinental Ins. Co.*, 949 F. Supp. 681, 688 (N.D. Ind. 1996) (finding sight draft and supporting documents to be "single instrument" because former was "useless" without latter).

Federal responds that the invoices were created for a different purpose than the Advance Requests: to bill a customer for landscaping services. But the purpose of the invoice depends on the context of its submission. While each invoice purports to be a bill for a landscaping customer, this does not mean the invoice was submitted *to Metro* to bill a landscaping customer. Obviously, in submitting an invoice to Metro, Arbor Green's purpose was to prove that it would receive money on an account, so that it could obtain a loan based on that collateral. In other words, the invoice was submitted to "explain" the collateral identified in an Advance Request. *See Tepfer*, 454 N.E.2d at 679.

Federal's attempt to distinguish *Community State Bank* is unpersuasive. Federal argues that in that case the power-of-attorney form and the promissory note evidencing the loan were executed at the same time, for the same purpose and as part of the same transaction of obtaining a loan, whereas here Metro alleges that the invoices purported to document separate, prior transactions between Arbor Green and third parties, and were not created at the same time as the Advance Requests. But in *Community State Bank*, the power-of-attorney form had been created and purportedly signed by the forger and a third party prior to the transaction at the bank. At the bank, the forger delivered that power of attorney along with the promissory note, which he then executed in the banker's presence. 542 N.E.2d at 1318. The simultaneous delivery of the documents, for the same purpose, controlled the court's ruling. *Id.* at 1320.

Finally, Federal's assertion that Metro relied not on the invoices but on the statements made in the Advance Requests and the Agreements is of no moment. Even if Metro maintained that it relied only on the Advance Requests, that would be analogous to the situation in

*Community State Bank*. There, the court ruled that, because the documents were a "single instrument," it did not matter that the bank said it had relied only on one of the documents. 542 N.E.2d at 1320. In any event, Metro did not need to specifically plead reliance on the invoices themselves to survive a motion to dismiss, as Metro's reliance on the invoices still is plausible under its complaint.

Accordingly, in determining coverage under the Bond, the court will consider each Advance Request and invoice together. Because Federal argues, and Metro does not dispute, that coverage exists only if either Insuring Clause 16 or 17 applies, the court confines its analysis to those clauses.

B. Insuring Clause 16A - Withdrawal Order

Insuring clause 16A, which bears the heading "Forgery or Alteration," covers losses resulting directly from, as relevant here, "Forgery on, or fraudulent alteration of, any . . . **Withdrawal Order** . . . ." Compl., Ex. 1, Bond at 8 (emphasis in original). A "Withdrawal Order" is defined in the Bond as a "non-negotiable instrument, other than an Instruction, signed by [Arbor Green] authorizing [Metro] to debit [Arbor Green's] account . . . ."

Federal argues that insuring clause 16A does not apply because Metro's allegations show that it has not sustained a loss as a direct result of a fraudulent alteration of any of the documents listed in clause 16A. Metro responds that, if the Agreements, Advance Requests, and invoices are considered together, they are a "withdrawal order" because they collectively authorize Metro to debit Arbor Green's account.

The court agrees with Federal that Metro's loss could not plausibly be covered under Insuring clause 16A. Metro's only argument is that all of the documents "clearly" authorize Metro to debit Arbor Green's account. But it's not clear how, and the court will not advance

legal arguments on Metro's behalf. *See County of McHenry v. Ins. Co. of the West*, 438 F.3d 813, 818 (7th Cir. 2006). Considering each Advance Request and invoice together, they do not empower Metro to withdraw money from Arbor Green's account; rather, they are applications for accounts-receivable financing. And each signed Advance Request "constitutes a binding legal obligation to repay" the amount advanced, along with interest. Compl., Ex. 3. That's an agreement to advance money on a line of credit; it is not an authorization to debit an account. Furthermore, even if the court considered collectively the Agreements, Advance Requests, and invoices, they could not plausibly be a "non-negotiable instrument . . . authorizing [Metro] to debit [Arbor Green's] account." The documents simply evidence an accounts-receivable loan arrangement between Arbor Green and Metro. Accordingly, Metro cannot plausibly recover under this clause.

### C. Insuring Clause 16B

Insuring clause 16B, which also bears the heading "Forgery or Alteration," covers losses resulting directly from:

> B. Transferring, paying or delivering any funds or other **Property**, or establishing any credit or giving any value in reliance on any written instructions to [Metro] authorizing or acknowledging the transfer, payment, delivery or receipt of funds or other **Property**, which instructions fraudulently purport to bear the handwritten signature of any **Member**, financial institution, or **Employee**, but which instructions either bear a **Forgery** or have been fraudulently materially altered without the knowledge and consent of such **Member**, financial institution or **Employee**.

Compl., Ex. 1, Bond at 8 (emphasis in original).

Federal argues that insuring clause 16.B applies only if the loss resulted directly from Metro's having loaned money to Arbor Green in reliance on "written instructions" to Metro that "fraudulently purport to bear the handwritten signature" of Arbor Green, but "either bear a **Forgery** or have been fraudulently materially altered without the knowledge and consent of

-10-

[Arbor Green]." Metro responds that insuring clause 16.B could be read to cover any loss resulting simply from "[t]ransferring, paying or delivering any funds or other Property." Under that reading, Metro's loss presumably would be covered because it was a result of delivering funds to Arbor Green.

Grammatically, Metro's reading is possible; without a comma setting off the phrase "in reliance on any written instructions" the subsequent qualifications could be read only to apply to the preceding phrase ("establishing any credit or giving any value"). But such a broad reading does not make sense given the heading for insuring clause 16—"Forgery or Alteration"—which strongly implies that the parties intended this clause to cover losses involving some element of forgery or alteration. Reading the clause as covering any "[l]oss resulting directly from . . . transferring, paying or delivery any funds or other property," whether or not it involved a "forgery or alteration," effectively would nullify the subheading's limitation.

Reading insuring clause 16.B, along with the contract as a whole, the court concludes that the clause could not plausibly cover Metro's loss. The only plausible reading of 16.B is that it covers an action taken by Metro—be it "[t]ransferring, paying or delivering any funds or other **Property**, or establishing any credit or giving any value"—only if it was in reliance on written instructions that "fraudulently purport to bear the handwritten signature" of a member, employee, or financial institution, but either bear a forgery or have been fraudulently altered without the knowledge and consent of that same member, employee, or financial institution. In other words, the clause covers situations where some third party has duped both (a) Metro and a member (i.e., a customer with an account there), (b) Metro and another financial institution, or (c) Metro and an employee. But here, Metro's theory is that the fraud was only on itself; the signatures were genuine and affixed by legitimate representatives of Arbor Green, Metro's

-11-

customer. In other words, the deception involved in the alleged scheme was not the identity of the person responsible for the instrument's contents, but the value of the collateral identified therein. *See Charter Bank Northwest v. Evanston Ins. Co.*, 791 F.2d 379, 382 (5th Cir. 1986) (finding no forgery where fraud involved deception about extrinsic facts rather than identity of signer). Thus, whether or not the Advance Requests and invoices could be considered "written instructions," Metro's allegations foreclose contentions that the documents "fraudulently purport to bear" Arbor Green's signature and were fraudulently altered without Arbor Green's knowledge and consent. Given Metro's allegations, there is no plausible path to relief on its claims under insurance clause 16.B.

D. Insuring Clause 17A - Evidence of Debt

As relevant here, insuring clause 17A, which has as its heading "Extended Forgery (Including Signature Guarantee)," covers "[l]oss resulting directly from [Metro] having, in good faith, for its own account or the account of others . . . acquired, sold, or delivered or given value, extended credit or assumed liability, in reliance on any original . . . **Evidence of Debt**, . . . which . . . bears a **Forgery**, or . . . is fraudulently altered . . . ." Compl. Ex.1, Bond at 8-9 (emphasis in original). The Bond defines "Evidence of Debt" as "an instrument, including a **Negotiable Instrument**, executed by a customer of [Metro] and held by [Metro], which in the regular course of business is treated as evidencing the **Member's** debt to [Metro]." Compl. Ex. 1, Bond at 19. (emphasis in original).

Federal argues that Metro's loss is not covered under this clause because none of the documents Metro relied on in extending credit to Arbor Green are negotiable instruments, promissory notes, or similar instruments evidencing a debt to Metro. *See First Union Corp. v. United States Fidelity & Guaranty Co.*, 730 A.2d 278, 282 (Md. Ct. Spec. App. 1999). Federal

-12-

also argues that the invoices themselves do not evidence any debt owed by Arbor Green to Metro, and that the Advance Requests are simply applications for accounts-receivable financing. Metro responds that the Advance Requests, invoices, and Agreements collectively may be considered evidence of a debt, as they memorialize Arbor Green's obligations to Metro.

Construing together each Advance Request and attached invoice, they are not an "Evidence of Debt," as that term is defined in the Bond. Rather, as Federal notes, the invoices purported to evidence Arbor Green's customer's debt to Arbor Green, and the Advance Requests themselves did not evidence a debt. *See Pine Bluff Nat'l Bank*, 346 F.Supp.2d 1020, 1027 (E.D. Ark. 2004) (concluding that leases submitted by customer evidenced third party's debt to customer, but not customer's debt to bank). According to Metro's allegations, the following arrangement was in place: Arbor Green would execute an Advance Request, which identified as collateral the accounts receivable on an attached invoice. Each Advance Request, when approved by a "duly authorized signatory of Arbor Green" would then constitute "a binding legal obligation to repay the principal sum *advanced* and all interest accrued as stipulated [in the Agreements]." Compl. Ex. 3 (emphasis added). If Metro approved an advance, it would issue a loan that was secured by the accounts receivable identified in the Advance Request. The amount Arbor Green actually owed (i.e., its debt to Metro) was the principal sum advanced, plus interest; it was not the amount on the invoice, nor was it necessarily the amount Arbor Green calculated as the maximum advance allowable on the Advance Request. Thus, each Advance Request and invoice were evidence of collateral, not debt. *See Pine Bluff Nat'l Bank*, 346 F.Supp.2d at 1027. Accordingly, taking Metro's well-pleaded facts as true, it is not plausible that Metro is covered under this term of the Bond.

### E. Insuring Clause 17A - Security Agreement

As relevant here, insuring clause 17A, which has as its heading "Extended Forgery (Including Signature Guarantee)," covers "[l]oss resulting directly from [Metro] having, in good faith, for its own account or the account of others . . . acquired, sold, or delivered or given value, extended credit or assumed liability, in reliance on any original . . . **Security Agreement**, . . . which . . . bears a **Forgery**, or . . . is fraudulently altered . . . ." Compl. Ex.1, Bond at 8-9 (emphasis in original). The Bond defines a Security Agreement as "an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." Compl. Ex. 1, Bond at 24.

Metro argues that, under the Agreements, Metro held a security interest in the property described in the invoices Arbor Green submitted with its Advance Requests. According to Metro, each Advance Request expressly incorporated the terms of the Agreements, and reflected Arbor Green's understanding that Metro would have an interest in, or lien on, Arbor Green's accounts receivables. Federal responds that only the Agreements created a security interest, and that the Advance Requests did not "amend the loan documents" nor create a separate agreement. Federal adds that the invoices themselves do not create any interest in Arbor Green's personal property.

The court concludes that relief is plausible under this clause. Each Advance Request identifies an invoice as "Collateral Pledged," which the parties understood would be security for the requested loan. Compl. Ex. 3. And each Advance Request, when approved by a "duly authorized signatory of Arbor Green" became "a binding legal obligation to repay the principal sum advanced and all interest accrued as stipulated [in the Agreements]." Accordingly, each Advance Request may be considered "an agreement which creates an interest in" the attached invoice, which "secures payment" on a loan. The court is not persuaded by Federal's argument

that the security interest was created in the Agreements, rather than in each Advance Request. Although the Agreements broadly provide that Arbor Green's accounts receivable would be security for the loans, it is the Advance Requests that create a security interest in the specific invoice identified in them as collateral. Accordingly, each may be considered a separate security agreement.

F. Fraudulent Alteration

Having concluded that coverage is plausible under Insuring Clause 17A, the court next addresses Federal's contention that Metro's pleadings show that it did not rely on a "fraudulently altered" document. According to Federal, the documents Metro attached to its complaint show that Arbor Green's scheme involved the creation of two different documents: one was an "original" invoice, identifying the correct amount owed, which Arbor Green would send to its customer; the other was a "fake" invoice that identified a different amount due, and was then delivered to Metro. Federal asserts that, because each scheme must have involved two "separate and distinct" invoices—the correct one sent to the customer, and the fake one sent to Metro—the latter could not be considered "fraudulently altered."

The term "fraudulently altered" is not defined in the Bond, and must therefore be given its plain and ordinary meaning. *See United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 930 (Ill. 1991). Black's Law Dictionary defines "fraudulent alteration" as "[a] change in terms of an instrument, document or other paper made with a dishonest and deceitful purpose to acquire more than one was entitled to under the original terms of the paper." *Black's Law Dictionary* 662 (6th ed. 1990). Meanwhile, the Illinois legislature has defined "alteration" as "(i) an unauthorized change in an instrument that purports to modify in any respect the obligation of a party, or (ii) an unauthorized addition of words or numbers or other change to an incomplete instrument relating to the obligation of a party." 810 ILCS 5/3-407(a)

(West 2009).

Metro's allegations about Arbor Green's scheme fit comfortably within these definitions. The "change" to each document clearly "purport[ed]" to modify Arbor Green's customer's obligation. And it is also a change made to a paper "with a dishonest and deceitful purpose"—to dupe Metro into advancing more credit. That Arbor Green may not have intended to "acquire more than [it] was entitled to" *from a customer* does not appear problematic; it is enough that Arbor Green intended to acquire more than it was entitled to *from Metro* "under the original terms" of the invoice.

Federal responds by citing cases involving alterations of negotiable instruments, which are covered by the Uniform Commercial Code. *See, e.g., Utica Mutual Ins. Co. v. Precedent Companies, LLC*, 782 N.E.2d 470 (Ind. App. 2003) (check was not altered because no evidence of unauthorized change that modified obligations of any party); *Charter Bank Northwest,* 791 F.2d at 383 (considering fake certificate of deposit and concluding that, under Texas UCC, "[a]lteration presupposes a genuine instrument that has been fraudulently changed.") But, as Metro notes, the UCC "does not apply to the formation, performance, and enforcement of insurance contracts." *Omnisource*, 949 F. Supp. at 686 (quoting James J. White & Robert S. Summers, Uniform Commercial Code: Hornbook Series §2 at 6 (2d ed. 1980).

Nor is the court persuaded by the one non-UCC case Federal relies on. In *Pine Bluff Nat'l Bank v. St. Paul Mercury Ins. Co.*, 346 F.Supp.2d 1020 (E.D. Ark. 2004), the court considered whether a bank was covered under a bond for losses resulting from extending credit in reliance on leases its customer submitted. The documents purporting to be leases did not in fact reflect the true terms of the leases the bank's customer had executed with a third party, so the bank claimed they were forged, altered, or counterfeited. The court concluded that there was a genuine issue of material fact whether the bank's loss was covered under an insuring clause for

losses resulting from relying on documents that bear a "forgery." *Id.* at 1029-30. But the court rejected the bank's contention that it had relied on an "altered" document. In its brief discussion of that issue, the court noted that the customer had retained in its possession the "true" leases, and that the bank held the "fake" leases. The court concluded that the bank would have had to possess the true leases (with alterations) for its loss to be covered under that term of the bond. *Id.* at 1028.

This court declines to extend the reasoning in *Pine Bluff* to this case. First, the *Pine Bluff* court reached its conclusion without citing any definitions to support its interpretation of the term "altered," which seems to this court somewhat restrictive and perhaps contrary to its plain and ordinary meaning. Second, in *Pine Bluff*, the documents at issue purported to be signed agreements between the bank's customer and a third party. It made more sense, then, to describe the "fake" leases as "forged" rather than "altered" versions of the originals, because they purported to be signed by a third party but were not. Here, the invoices are not signed; they appear to be computer printouts. Under these circumstances, it would defy common sense to conclude that, because Metro may not have relied on the same physical printout as was sent to Arbor Green's customer, it did not rely on a fraudulently altered document. In a digital age, changing a document on a computer—which seems to have been Arbor Green's method, although it is not clear—is no less an "alteration" than making a change to a physical piece of paper.

Finally, the *Pine Bluff* court reached its conclusion at summary judgment, when the full details of the scheme had been fleshed out. This court declines to do so on a motion to dismiss. As Metro notes, it has not alleged in its complaint that the invoices Arbor Green submitted were altered "copies" as opposed to altered "originals." Thus, even under Federal's restrictive definition, Metro still may plausibly succeed.

## IV. CONCLUSION

Accordingly, the court DENIES the motion to dismiss.

                                        Enter:

                                        /s/ David H. Coar
                                        David H. Coar
                                        United States District Judge

Dated: **March 30, 2009**